Filed 6/17/24  In re D.S. CA4/1
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| In re D.S. et al., Persons Coming Under the Juvenile Court Law. | |
| | D083401 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. Nos. EJ4901A-B) |
| v. | |
| S.M., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of San Diego County, Mark T. Cumba, Judge.  Affirmed in part, reversed in part, and remanded with directions.

Neale B. Gold, under appointment by the Court of Appeal, for Defendant and Appellant.

Claudia G. Silva, County Counsel, Lisa M. Maldonado, Chief Deputy County Counsel, and Indra N. Bennett, Deputy County Counsel, for Plaintiff and Respondent.

S.M. (Mother) appeals the juvenile court orders declaring her twin sons, D.S. and E.S. (together, the children), dependents of the court pursuant to Welfare and Institutions Code[1] section 300, subdivision (a). Although Mother does not contest the juvenile court's exercise of jurisdiction over the children based on Father's actions, she seeks to challenge certain jurisdictional findings as to her. Specifically, Mother argues that substantial evidence does not support the court's findings that she failed to protect her children and follow an agreed-upon safety plan. Additionally, she asserts the court abused its discretion by ordering her to complete a 52-week child abuse group (Child Abuse Group).[2]

Even if Mother's jurisdictional arguments are moot, we elect to exercise our discretion to consider the merits of her contentions. But concluding that substantial evidence supports the court's findings, we nonetheless affirm. As to the dispositional order, however, we find on this record that the court abused its discretion in ordering Mother to complete the Child Abuse Group. We therefore reverse that order and remand for the court, in its discretion, to supplement the record or consider alternative services.

## FACTUAL AND PROCEDURAL BACKGROUND

**A.** *Circumstances Leading to the Petition*

The children were born prematurely in September 2023, when Mother was 19 years old. Later that same month, the Agency received a report about Mother, who had indicated to the reporting party that she felt unsafe in the

---

[1] Statutory references are to the Welfare and Institutions Code.

[2] The court and the Agency refer to the mandated service at issue as the "Child Abuse Group," and we follow suit. As explained below, we are unable to further describe the program because the record is devoid of any additional information.

home because J.S. (Father) has aggressive outbursts, hits furniture, and yells. She informed the reporting party that Father gets frustrated with the children when bottle feeding and "aggressive" with them in an unspecified manner. Mother "indicated she does not want the babies to continue experiencing" Father's aggression. The reporting party provided Mother information for domestic violence hotlines in addition to making the Agency report.

Then, on October 10, 2023, Mother sent text messages to a sex trafficking detective, whom she knew from a previous matter, reporting that she had woken up because Father was violently shaking one of the children (she believed D.S.) on the bed. She wrote that she was "in a really bad situation and . . . really scared," "[didn't] know if the baby [was] okay," and wanted "help . . . to get away" because Father would not let her leave with the children. She was afraid if she called 911 in his presence that he would hurt the babies. After receiving Mother's messages, the detective called 911 and Father was arrested.

An ambulance took Mother and the children to the hospital, where testing did not immediately reveal any injuries. But doctors later discovered a healing rib fracture on E.S. that required force " 'well outside the realm of normal care and handling.' " They believed the fracture was "indicative of physical abuse" and noted an "extreme risk of ongoing and potentially escalating forms of physical abuse which may ultimately prove to be fatal" if the children were to return to the home under the same circumstances. They also expressed "significant concerns" about intimate partner violence in the form of coercion involving "isolating [a partner], monitoring [her] movements, and restricting [her] access to transportation, financial resources,

3

employment, or medical care." As a result, the doctors feared Mother lacked the ability to protect her children.

Mother told the hospital social worker that Father's relatives were unhappy with her after she reported the shaking incident. They threatened that Father would fight for custody of the children. The social worker expressed concern that Mother lacked any family support and did not seem to know how to protect the children alone. She had neither a driver's license nor any alternative means of transportation. After discharge from the hospital, Mother did not want to file a restraining order against Father, declined hotel vouchers, and refused to go to a shelter.

## B. *Initial Agency Involvement*

The Agency's protective services worker (PSW) visited the home on October 11, 2023. Father was out on bail and home with Mother and the children. During the visit, Mother demonstrated love and appropriate care for the children.

Mother informed the PSW that Father had once hit the couch right next to where she sat with one of the children and had forcefully shoved pacifiers in the children's mouths and grabbed their legs during diaper changes. Based on this behavior and Father's increasing aggression toward the children over the previous few weeks, "she [was] worried what [would] happen next." Mother stated, "The [F]ather would never hurt her or the infants but when he becomes angry it's a blind rage." After the shaking incident, however, she did "not want the [F]ather around the infants until he [got] help with his anger," because "she [didn't] know or trust when he will get angry again and hurt the babies." Mother explained that, instead of seeking to address his anger issues, Father blamed her for the shaking

4

incident because she had taken Benadryl for itching and could not wake up when he asked her to help.

Father admitted to the PSW that he had issues with anger and had shaken D.S. He accepted a safety plan which involved him living out of the house and having visits with the children only with a designated support person, a friend of Father. Mother agreed that she would call 911 if he came to the home without supervision.

The day after the Agency visit, Father entered the home unsupervised to take a shower. He came to the residence on a second occasion later that day, this time accompanied by the designated supervisor, but both were under the influence of marijuana. During the second visit, Father was alone in a room with one of the children in violation of the safety plan.

Mother did not immediately call 911 as the safety plan required, but rather contacted the PSW the next day. She stated she could not prevent Father from entering his house with a key. Based on this incident, she requested assistance from the PSW to move with the children to her godmother's house several hours away. The PSW obtained sleeping and feeding supplies for Mother and arranged transportation for the next morning. But on the night before the scheduled departure, Mother called to inform the PSW that she no longer wanted to go to her godmother's; rather, she sought to try a safety plan again.

On October 13 and 14, the PSW requested that the police conduct welfare checks on the children. But when officers knocked, no one came to the door. Mother answered her phone, but she was not cooperative with the officers and hung up on them twice.

Two days later, on October 16, 2023, the PSW attempted to serve and execute a protective custody warrant while accompanied by law enforcement.

5

Mother answered the door, refused to comply with the warrant, and made a phone call. Father and paternal grandmother soon arrived, yelling and becoming aggressive. Law enforcement and the PSW felt that the situation was unsafe, and they left.

The next day, the PSW again unsuccessfully attempted to serve the protective custody warrant at the family home. She then went to paternal grandmother's home. Paternal grandmother informed the PSW that Mother was staying with a paternal relative, but refused to disclose the relative's identity or location. The grandmother took issue with the Agency's concerns, stating that Father merely shook his own body but not the baby. She claimed Mother had exaggerated the situation. During the course of the discussion, the grandmother yelled at the PSW and called her a liar.

The PSW also spoke with paternal grandfather, who stated that Mother and Father were "hiding" from the Agency. He expressed his opinion that Mother "overreacted" and the parents did not need Agency involvement.

C. *The Juvenile Dependency Petition and Detention Hearing*

In October 2023, the Agency filed juvenile dependency petitions on behalf of the children, alleging jurisdiction under section 300, subdivision (a). The petitions noted that: (1) Father shook D.S., had forcefully shoved pacifiers into the children's mouths and had grabbed their legs hard when changing diapers; (2) E.S. had suffered a rib fracture indicative of abuse;[3] (3) following the shaking incident, the parents agreed to a safety plan limiting Father to supervised contact, but the parents violated that plan the following day; and (4) Mother failed to take sufficient actions to protect the children.

---

[3] The petition was amended at a December 6, 2023, hearing to add the later-discovered rib fracture suffered by E.S.

After learning that Mother was staying with a paternal great-aunt, the PSW met with Mother at the aunt's home. Mother slept on the couch and used cushions and pillows to create a sleeping area for the children, despite knowing that this sleeping arrangement was unsafe for the children. Mother explained "that she didn't want to move the bassinet from her home . . . to look like fleeing."

At the detention hearing several days later, the court found that the petition established a prima facie case under section 300, subdivision (a), and ordered the children detained with Mother at paternal great-aunt's home. The order required Father to stay away from paternal great-aunt's home, but provided for liberal professionally supervised visitation without Mother present.

## D. *Prehearing Reports and the Jurisdictional/Dispositional Hearing*

The PSW interviewed the parents in November 2023, prior to the jurisdictional and dispositional hearing. Father acknowledged shaking D.S. with enough force to wake up Mother. He also admitted to acting forcefully with the children during feedings and diaper changes. Mother conceded that Father has anger issues, and she believed he needed to work on them before being around the children. But "[w]hen asked if she has any concerns about the [F]ather's ability to safely care for the children, the [M]other denied, stating, 'No. He gets them everything they need. He's really good with the babies. He just needs to control his anger.'"

As of the Agency's December 2023 addendum report, Father began his Child Abuse Group. Mother did not. The Agency was concerned that Mother lacked insight into her role in protecting the children from harm, given that she failed to contact emergency services for several hours after she witnessed Father shake the child and she apparently took no action after witnessing

7

father using "excessive force" on the children on multiple other occasions. Further, without informing the Agency, Mother went to stay with a friend for three days to help the friend with childcare. Yet Mother declined services for her children and counseling for herself, claiming she was too busy caring for the children to find time to schedule services.

According to the Agency's staff psychologist, "[P]er the Agency's policy in cases of this nature, both parents will need to attend Child Abuse Group." Then, "if a parent's provider determines that the parent has mental health issues that are interfering with their success in group, the provider will refer them to individual therapy."

The court held the contested jurisdictional and dispositional hearing on December 21, 2023. Without objection, the court received into evidence the October 2023 detention and addendum reports; the jurisdiction and disposition report dated November 14, 2023; and two December 2023 addendum reports. The court heard argument from the parties. Mother took the position that she responded appropriately to the shaking incident and did not lack protective capacity; she also requested individual therapy rather than a Child Abuse Group, which she would attend with parents who physically hurt their children. She additionally opposed being required to take a parenting class. The Agency believed a Child Abuse Group was appropriate because of Mother's failure to obtain immediate care for her child after the shaking incident due to fear of Father, and her pattern of being concerned about the children, requesting assistance, and then changing her mind.

The court made a true finding on the Agency's petition, concluding that removal from the custody of Father was appropriate due to substantial danger to the physical health, safety, protection, or physical or emotional

8

well-being of the children if they were returned home.  In so holding, the court noted that Mother was present during, had knowledge of, and witnessed Father's abuse.  The amended petitions thus included allegations that "the parents agreed to a safety plan with the Agency in that the Father's contact with the child would be supervised by a third party but they failed to follow the safety plan on or about October 12, 2023 and the mother has failed to take suitable actions to protect the child[ren]."  However, the court's order provides for continued placement with Mother, which "would not be detrimental to the child due to being the nonoffending parent."  The court additionally ordered reunification services for Mother and Father, including parenting classes and a Child Abuse Group for both, requiring the Agency make reasonable efforts to accommodate Mother's request for online services.

## DISCUSSION

On appeal, Mother challenges:  (1) the juvenile court's jurisdictional findings that she was insufficiently protective of the children and violated the safety plan, and (2) the portion of the court's dispositional order requiring her to complete a 52-week Child Abuse Group.

### A.  *Jurisdictional Findings*

While Mother acknowledges that Father's conduct creates a sufficient basis for jurisdiction over the children, she asserts we should nonetheless consider the merits of her argument regarding the language of the petition. Mother contends substantial evidence does not exist to support the petition's language, found true by the court, that she failed to protect her children and abide by the safety plan.

####    1.  *Without deciding mootness, we conclude discretionary review of Mother's argument is appropriate*

Generally, an appeal of jurisdictional findings in a juvenile dependency case is moot where those findings "have been made as to both parents but

9

only one parent brings a challenge," and the findings against the other parent remain unchallenged. (*In re D.P.* (2023) 14 Cal.5th 266, 283 (*D.P.*); *In re D.M.* (2015) 242 Cal.App.4th 634, 638–639.) This is true because "[d]ependency jurisdiction attaches to a child, not to his or her parent." (*In re D.M.*, at p. 638.) Thus, if " 'any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence . . . the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence.' " (*In re I.J.* (2013) 56 Cal.4th 766, 773.) And here, Mother concedes that jurisdiction over the children is proper based on Father's conduct.

However, an appeal of jurisdictional findings is not moot if the appellant "demonstrat[es] a specific legal or practical consequence that would be avoided upon reversal of the jurisdictional findings." (*D.P.*, *supra*, 14 Cal.5th at p. 273.) To avoid mootness, the appellant cannot merely raise "speculative future harm." (*Id.* at p. 278.) Mother contends her appeal is not moot because the jurisdictional findings at issue are "tied to" the dispositional order requiring her to participate in the Child Abuse Group and because she "could be" reported to the Child Abuse Central Index.

Even when an appeal is technically moot, we have discretion to review the merits of the challenge. (*D.P.*, *supra*, 14 Cal.5th at p. 282.) In *D.P.*, our Supreme Court provided a nonexhaustive list of factors warranting discretionary review of a jurisdictional finding in the dependency context, including: "whether the challenged jurisdictional finding 'could be prejudicial to the appellant or could potentially impact the current or future dependency proceedings,' or ' "could have other consequences for [the appellant], beyond jurisdiction" ' "; "whether the jurisdictional finding is based on particularly pernicious or stigmatizing conduct"; and whether "the findings against the

10

parent who has appealed are based on more serious conduct." (*Id.* at pp. 285–286.)

We find it unnecessary to definitively determine whether Mother's appeal is moot because, in any event, we conclude it is appropriate to exercise our discretion to consider Mother's arguments. In *D.P.*, the court indicated allegations that a parent exposed a child to a substantial risk of abuse are "particularly pernicious," supporting discretionary review, citing *In re M.W.* (2015) 238 Cal.App.4th 1444, 1452, and *In re L.O.* (2021) 67 Cal.App.5th 227, 237. (*D.P.*, *supra*, 14 Cal.5th at pp. 285–286.) While the failure-to-protect allegations against the appealing parents in *In re M.W.* and *In re L.O.* are somewhat more egregious than those that are directed at Mother here, still we think the prudent course of action is to exercise discretionary review.

### 2. *The record contains substantial evidence to support the court's jurisdictional findings*

Mother argues that the record lacks substantial evidence to support the allegation that she violated the safety plan and failed to protect the children. In particular, she objects to the court's true finding as to the petition's statement: "On October 11, 2023, the parents agreed to a safety plan with the Agency in that the [F]ather's contact with the child would be supervised by a third party but they failed to follow the safety plan on or about October 12, 2023 and the [M]other has failed to take suitable actions to protect the child."

In reviewing jurisdictional findings, " 'we look to see if substantial evidence, contradicted or uncontradicted, supports them. [Citation.] In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations;

11

and we note that issues of fact and credibility are the province of the trial court.' " (*In re R.T.* (2017) 3 Cal.5th 622, 633.)

Here, the Agency made a section 300, subdivision (a), allegation against Father for inflicting nonaccidental harm on the children.[4] As part of that allegation, the Agency noted that Mother failed to protect the children from that harm and failed to comply with the subsequent safety plan. The Agency did not allege, nor did the court find, that Mother inflicted nonaccidental harm on the children or that she posed any risk of doing so. To the contrary, the court's minute order states the children are being placed with Mother because she is the nonoffending parent.

The record contains substantial evidence to support the petition's statements regarding Mother. First, weeks prior to the shaking incident, Mother reported that Father was aggressive toward the newborn babies and she no longer wanted the children to be exposed to that aggression. Yet she and the children remained in the home with Father. Second, after witnessing the shaking incident, Mother stated that she did not know if the baby was okay but would not call 911 because she was afraid of Father. Third, Mother concedes in her opening brief that the record demonstrates "there was a brief period where the parents broke the safety plan." After it happened, Mother failed to immediately report Father's unsupervised entry into the home and time alone with one of the children. Fourth, following the breach of the safety plan, Mother requested assistance leaving town so she could travel to her godmother's home. But then she canceled that reasonable plan and thereafter refused to cooperate with police attempts to conduct welfare checks. Finally, when the Agency sought to serve a protective custody

---

[4] Unlike other subdivisions of the statute (e.g., Welf. & Inst. Code, § 300, subds. (b)(1)(A), (b)(1)(B), (d), (i)), subdivision (a) of section 300 does not base jurisdiction on a parent's failure to protect the child.

12

warrant, Mother summoned Father and paternal grandmother, who became aggressive. Thereafter, Mother left the home to hide from the Agency.

So even though a failure to protect is not a statutory basis for jurisdiction under subdivision (a) of section 300, this evidence is sufficient to support the allegation and corollary finding that Mother failed to take suitable actions to protect her children or comply with the safety plan. Based on that evidence, the court could have permitted the Agency to amend the petition according to proof to make a section 300, subdivision (b)(1)(A), allegation against Mother. (§ 348; Code Civ. Proc., §§ 469 & 470.) But the fact it did not do so is immaterial. Mother suffered no prejudice because the petition provided adequate notice of the Agency's allegations and the court made proper factual findings based on substantial evidence. (See *In re John M.* (2012) 212 Cal.App.4th 1117, 1123 [" ' "[I]f the jurisdictional findings are supported by substantial evidence, the adequacy of the petition is irrelevant." [Citation.]' [Citation.] 'The only exception occurs when a parent claims a petition fails to provide actual notice of the factual allegations.' "]; *In re Jessica C.* (2001) 93 Cal.App.4th 1027, 1037–1038 ["[A]fter a hearing on the merits has been held on the petition, the focus must necessarily be on the substance of the allegations found true by the juvenile court."].)

## B. *Dispositional Order*

Mother next contends the juvenile court abused its discretion in requiring her to submit to a 52-week Child Abuse Group. We agree that the Child Abuse Group is not justified for Mother on this record.

" 'The juvenile court has broad discretion to determine what would best serve and protect the child's interests and to fashion a dispositional order accordingly.' " (*In re Natalie A.* (2015) 243 Cal.App.4th 178, 186.) Therefore, "[w]e review the propriety of court-ordered reunification services at this stage

13

for abuse of discretion." (*In re D.C.* (2015) 243 Cal.App.4th 41, 56.) But the court's authority to fashion reunification orders is not "unfettered," (*In re Nolan W.* (2009) 45 Cal.4th 1217, 1229 (*Nolan W.*)), as these orders must be 'designed to eliminate those conditions that led to the court's finding that the child is a person described by Section 300' (§ 362, subd. (d)). Further, the court-approved " 'reunification plan " 'must be appropriate for each family and be based on the unique facts relating to that family.' " [Citation.]' " (*Nolan W.*, at p. 1229.)

Thus, in every child welfare case, the Legislature requires the Agency to prepare a case plan that ensures, among other things, "that services are provided to the child and parents or other caretakers, as appropriate, in order to improve conditions in the parent's home, to facilitate the safe return of the child to a safe home." (§ 16501.1, subd. (a)(1)–(2).) "The case plan shall be included in the court report, and shall be considered by the court at the initial hearing and each review hearing." (§ 16501.1, subd. (g)(14).) Further, the court must consider whether the case plan meets the requirements of section 16501.1. (Cal. Rules of Court, rule 5.690, subd. (c)(2)(A); *In re M.R.* (2020) 48 Cal.App.5th 412, 424.) If it does not, "the court must order the agency to comply with the requirements of section 16501.1." (Cal. Rules of Court, rule 5.690, subd. (c)(2)(B).) In sum, because the court cannot arbitrarily order parents to participate in counseling and education programs that are " 'not reasonably designed' " to eliminate the behavior or circumstances that led to the court taking jurisdiction of the child, "the case plan must identify specific goals and then explain how the 'planned services' are designed to achieve those goals." (*In re M.R.*, at p. 424.) Thus, it is an abuse of discretion to order services for one parent based on the need to eliminate behavior of the other parent. (See *In re Drake M.* (2012) 211

14

Cal.App.4th 754, 770–771 ["The trial court abused its discretion in ordering father to take parenting courses because such an order is not reasonably designed to eliminate mother's behavior, which led to the trial court's finding that Drake is a person described by section 300."], disapproved of on other grounds in *In re N.R.* (2023) 15 Cal.5th 520 and *D.P.*, *supra*, 14 Cal.5th 266.)

In this case, the Agency identified the goal for Mother as "help[ing] protect her children from being impacted by physical abuse, substance use, and domestic violence." In doing so, she should "demonstrate an understanding of her role and responsibility to protect her children from physical harm," "demonstrate a commitment to keeping herself and her children safe by not being involved or around people who are known to react aggressively or violently," and "ensure that she protects her children from unsafe situations or individuals and be able to identify red flags for physical abuse." However, the record is devoid of even minimal detail regarding the content of the Child Abuse Group, and it remains unclear how the 52-week group would achieve Mother's case plan goals. Indeed, the Child Abuse Group requirement for Mother is the same requirement placed upon Father in the case plan. Yet their roles leading to this dependency case were distinct; there are no allegations that Mother inflicted harm upon the children or presented any risk of doing so.

It may be that the Child Abuse Group recommended by the Agency includes instruction on the need to protect children from physical abuse by a partner, such that it would benefit Mother in recognizing how her actions harmed the children and what steps she must take in the future to safeguard their health and safety. But the record before us fails to explain what topics are addressed by the group or indicate that even a portion of the curriculum covers protection from abuse by others, as opposed to direct abuse. Without

15

any further information about what the class entails, we cannot conclude the 52-week Child Abuse Group is appropriately targeted to assisting Mother protect the children from abuse by others. (*Nolan W.*, *supra*, 45 Cal.4th at p. 1229 [requiring that reunification services "be based on the unique facts relating to that family"].)

Accordingly, as to the order that Mother participate in a 52-week Child Abuse Group, we reverse and remand for further proceedings at which the Agency can provide a basis for why this group will address Mother's issues with respect to the children, or the court can consider alternative options.

## DISPOSITION

The portions of the December 21, 2023, dispositional orders requiring Mother to participate in a 52-week Child Abuse Group are reversed, and the matter is remanded for reconsideration of that issue consistent with this opinion. The jurisdictional and dispositional orders are otherwise affirmed.

DATO, Acting P. J.

WE CONCUR:

DO, J.

BUCHANAN, J.

16